IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AWNTWANAY SWEPSON,

Plaintiff,

v.

AIMBRIDGE EMPLOYEE CORP.,

Defendant.

Case No. 6:23-cv-01040-HLT

## MEMORANDUM AND ORDER

This is an employment-discrimination case based on disability. Plaintiff Awntwanay Swepson[1] sues her former employer, Defendant Aimbridge Employee Corp., for failure to accommodate her disability, disparate treatment based on disability, and a hostile work environment based on disability. Aimbridge moves for summary judgment on all claims. Doc. 155.

The Court has spent considerable effort analyzing Swepson's case. But the time spent and the length of this order are not indicative of any merit to her claims. As discussed below, the Court finds no reasonable jury could conclude that Swepson is disabled. Absent this threshold showing, all her claims fail. Even if Swepson could establish that she was disabled, she has not pointed to any evidence showing that Aimbridge failed to give her any requested accommodations, that she suffered any adverse action because of any disability, or that she experienced a severe or pervasive hostile work environment based on disability. The Court therefore grants Aimbridge's motion. Aimbridge is entitled to summary judgment on all claims.

---

[1] Because Swepson proceeds pro se, her pleadings are construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The Court does not, however, assume the role of advocate. *Id.*

I.    **BACKGROUND**

A.    **Swepson's Factual Responses**

The factual record has been difficult to parse. Aimbridge's opening brief lists seventy facts with citation to supporting evidence. Swepson's response appears to dispute each of those facts. She includes a cite to deposition testimony and some bullet points for each response. But the cited deposition testimony often is unrelated to Aimbridge's fact. And the bullet points are often stray comments that do not address Aimbridge's fact or Swepson's cited deposition testimony. Swepson's submissions thus don't actually dispute anything and instead support many of Aimbridge's facts.

Swepson's response brief also includes seventy additional facts. Doc. 176 at 19-31 (cited as "PSOF").[2] She then includes a Roman numeral list in support of each fact and concludes by asserting that her fact disputes one of Aimbridge's facts. *See id.* But, again, nothing seems to match up. Just as Swepson's response facts don't align with Aimbridge's facts, nor do the additional facts align with either the response facts or Aimbridge's facts. Further, many of Swepson's additional facts are not facts at all. They are legal conclusions. *See, e.g.*, PSOF 1 ("This constitutes spoliation and is pretextual."); PSOF 4 ("This reflects the defendant's attempt at plausible deniability."); PSOF 6 ("This demonstrates discrimination."); PSOF 8 ("This is pretextual and created a hostile work environment."); PSOF 10 ("The plaintiff suffered harassment on three occasions."); PSOF 11 ("The plaintiff qualifies as disabled under the ADA."); PSOF 14 ("Reckless disregard shown by the defendant."); PSOF 17 ("Proves a hostile work environment."). Many take issue with the Kansas Human Rights Commission's ("KHRC") investigation and conclusion. *See* PSOF 1-26.

---

[2]    Swepson separately filed her exhibits about a week after her response. *See* Doc. 177. The exhibits included a document titled "Memorandum in Support of Response to Motion for Summary Judgment." Doc. 178. Although the role or purpose of this filing is not clear, the Court has considered it.

Others appear to be a response to the position statement submitted by Aimbridge to the KHRC. *See* Doc. 178-1 at 51-58.[3] Many just recite something Aimbridge said in its KHRC position statement with either a summary denial or an assertion that Aimbridge cannot provide evidence to support the claim. *See, e.g.*, PSOF 29-33, 35, 37-38, 40, [46],[4] 47, 59-60, 62. Others still are just conclusory statements in general. *See, e.g.*, PSOF 55-58, 64.

The Court is mindful of Swepson's pro se status. It does not point out the problems with the facts to criticize Swepson, who has clearly tried to litigate this case. Rather, it does so to note how difficult it has been to determine the undisputed facts and whether any material facts are genuinely disputed.

The "Notice to a Pro Se Litigant Who Opposes A Summary Judgment Motion" explained Swepson's obligations in responding to the summary-judgment motion. *See* Doc. 158. It stated that Swepson cannot simply fall back on her claims but "must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts that support your claim." *Id.* at 1. The notice also quoted Federal Rule of Civil Procedure 56, which details the procedures for responding to facts. *See* Doc. 158 at 2. And it included D. Kan. Rule 56.1, which states that an opposing brief must contain a "concise statement of material facts as to which the party contends a genuine issue exists" and that "[e]ach fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed." Swepson's response facts and additional facts do not comply with these rules. And Swepson's "pro se status does not excuse her from following the strict requirements of Rule 56 in order to properly contest a

---

[3]    The KHRC's report is not included in the record. Nor are the conclusions of the KHRC directly relevant or impactful on the decisions in this case.

[4]    PSOF 46 appears to be misnumbered as there are two PSOF 47s. Doc. 176 at 27.

summary judgment motion." *Schlecht v. Lockheed Martin Corp.*, 626 F. App'x 775, 778 (10th Cir. 2015).

Given the failure to comply with Federal Rule of Civil Procedure 56 and D. Kan. Rule 56.1, the Court would be well within its authority to simply deem Aimbridge's facts undisputed and proceed with analyzing the motion based only on the facts in Aimbridge's brief. *Dempsey v. City of Baldwin City, Kan.*, 333 F. Supp. 2d 1055, 1059 (D. Kan. 2004) ("Thus, where allegedly disputed facts are not directly controverted by evidence contained in the record, the court considers those facts uncontroverted pursuant to Fed. R. Civ. P. 56."). The Court has, however, opted to carefully review Swepson's submissions to try to discern whether any material facts are genuinely disputed. What follows is a summation of the facts as stated in Aimbridge's motion (cited as "DSOF," *see* Doc. 156 at 8-18), as supplemented by Swepson's response facts (cited as "Response," *see* Doc. 176 at 10-19), and her additional facts (cited as "PSOF," *see id.* at 19-31).

Any points of dispute are noted. But most of the facts are not in dispute. The Court construes the facts in Swepson's favor as the non-moving party, as it must.

### B.   Undisputed Facts

Aimbridge is a hotel management company. DSOF 1; Response 1. The general manager in July 2021 was Sayed Azazy. DSOF 8; Response 4. The assistant general manager was Lori Kaufman. DSOF 9.

Aimbridge employed Swepson at the Aloft Hotel in Wichita as a "Front Desk Agent/Housekeeping" from July 1, 2021, to October 31, 2021. DSOF 2; Response 2. Although Swepson primarily worked as a Front Desk Agent, she also performed laundry attendant duties. DSOF 6. Her pay was $11/hour. DSOF 7; Response 3. Swepson did not apply for any other

positions. DSOF 10. A supervisor position opened at one point, but Swepson did not apply because she didn't want to work full time and liked her current job. *Id.*; *see also* Response 10.[5]

Aimbridge had anti-discrimination policies, as well as a policy for accommodating disabilities. DSOF 3-4. The accommodations policy directed employees to initiate the interactive process with their manager and to report any discrimination to human resources. DSOF 4. Swepson was aware of these policies. DSOF 5; Response 1.

### 1.      Disabilities

In her deposition, Swepson testified she is "totally and permanently disabled" and has both physical and mental disabilities. DSOF 12. This includes a disability involving her right foot, which is based on diagnoses in 2018 for plantar fasciitis, anterior talo ligament sprain, and multiple stress fractures. DSOF 13. Swepson wore a boot for plantar fasciitis in 2018 and 2019, but she has not had to wear a boot since. DSOF 14. Swepson believes plantar fasciitis is a lifelong disability. *Id.* Swepson's sprained ankle and stress fractures occurred when she was physically assaulted while in basic training in the Army. DSOF 15. She had physical therapy until being released from duty in December 2018. *Id.* Swepson testified her leg healed incorrectly and she has a limited range of ankle motion, which makes the injuries permanent. *Id.* Swepson worked remotely from December 2018 to May 2019 because of her injuries but then started working at Twin Peaks because her foot injury had healed. DSOF 16.

---

[5]     Swepson does not provide any evidence disputing this fact. She does include this statement in Response 10: "The statement suggests the Plaintiff liked her existing position and did not want to work full-time, yet she was employed as a Front Desk Agent/Housekeeping, roles that often demand considerable time and effort, potentially close to full-time hours. This raises doubt about whether the Plaintiff's refusal to apply for the supervisor position was genuinely due to a preference for her existing role or a reluctance to assume a full-time role." This is not a statement of fact but rather a supposition. Nor is it sufficient to posit that "contradictions regarding the plaintiff's application for promotions and the handling of her training requests suggest that there may be more to investigate about the fairness and transparency of [Aimbridge's] decisions." Response 17. This does not dispute the fact that Swepson did not apply for other positions or for a promotion.

Swepson testified that her physical disabilities impact her life while sitting, standing, laying down, cleaning, cooking, sleeping, washing or doing her hair, enjoying herself, traveling, bathing, showering, and during bowel movements. DSOF 17. However, she lives alone, is able to care for herself, and is able to drive. *Id.*

Swepson says her physical disability impacts her job because she occasionally needs a chair, though she testified she tries to see how long she can stand before sitting. DSOF 19. Before she was hired, Swepson told Aimbridge she would need a chair. DSOF 20. Aimbridge did not ask for documentation. *Id.* But when she started working, Swepson said she would not need a chair and wanted to "see how heavy the caseload is." DSOF 21; *see also* Response 36 ("The plaintiff initially stated she would need a chair but later indicated she wanted to 'see how heavy the caseload is' before deciding on the chair."). Swepson decided by her third day that she needed a chair, and Aimbridge provided one. DSOF 21; Response 6, 36. Swepson used the chair regularly for the duration of her employment. DSOF 21. Although she used the chair regularly, she would also choose to stand at times. Response 36.

At some point during her employment, Swepson recalls Azazy asking for medical documentation regarding how long she needed to sit, but Aimbridge has no record of receiving this information. DSOF 22. Other than Azazy and Kaufman, Swepson only told one other manager—Nate O'Neal—that she was disabled and needed a chair. DSOF 23. But she did not give specifics and told him that the specifics of her disability were not his business. *Id.*

Swepson also has PTSD, depression, and anxiety. DSOF 18. She has not identified any way these mental disabilities limit her major life activities. *Id.* Swepson did not disclose PTSD, depression, or anxiety to anyone at Aimbridge. DSOF 26; Response 31, 48.

In terms of other accommodations, Swepson once asked to leave work early because she was "uncomfortable," and Aimbridge allowed her to leave. DSOF 24. Swepson also asked for an accommodation in being scheduled for six or six-and-a-half hour shifts. DSOF 25. Aimbridge complied by giving her a "flex seven hours," which included two breaks and 30 minutes for lunch. DSOF 25. Swepson testified she "was working well having those accommodations being met." *Id.*; Response 6.

## 2.    Incidents With Coworkers

Swepson's disparate-treatment claim is based on three incidents with coworkers. DSOF 28.[6] The first incident involved Charles McDonald, a bartender. *Id.* Kaufman and Azazy asked Swepson if she wanted to cross-train as a bartender. DSOF 33. Swepson trained with McDonald on July 21-23, 2021. DSOF 34. Swepson asked her manager if she could have access to a chair, and he said she could. DSOF 35; Response 7. But when Swepson informally asked McDonald if she could sit, he told her she could not sit down while working as a bartender. DSOF 36; Response 8. He did say she could sit on a chair at the end of the bar but that he could not train her from that position. DSOF 37. Swepson argues this could suggest "a potential issue with how the request was handled." Response 9. Swepson did not share the nature of her disabilities with McDonald. DSOF 41; Response 11. Swepson immediately called her manager and said she felt McDonald had spoken to her in a condescending way and was rude. DSOF 38-39. She asked to leave her shift early, and the manager approved. DSOF 39; Response 40. Swepson claims this "could indicate a legitimate concern about her training experience." Response 9. Swepson did not return to work at the bar because she felt McDonald was difficult to work with and she had learned as much as she could from him. DSOF 40. Swepson claims she was given inadequate training and denied the ability to

---

[6]    As discussed below, the arguments in the brief expand somewhat on her claim of disparate treatment.

use a chair. *See* Response 6, 38. But she also states she did not disclose her disabilities to McDonald when she requested a chair. Response 39. There were no open bartending positions in July 2021. DSOF 42. Swepson also testified that being a bartender did not interest her. DSOF 62; Response 20, 29, 62.

The second incident involved Jerry Simpson. DSOF 28. On October 14, 2021, Swepson's second-to-last work shift with Aimbridge, DSOF 43-44, Swepson came from behind the front desk while Simpson was approaching, DSOF 45. According to Swepson, Simpson pushed her to get around her, and then she pushed him back. DSOF 46; Response 50-51. Simpson denied touching Swepson. DSOF 47; Response 51. After the incident, Swepson pressed the panic button at the front desk, and then called 911 from her cell phone. DSOF 48. The police made a report but said either party would have to go to the station to press charges. DSOF 49; Response 52, 58. Neither Swepson nor Simpson pressed charges. DSOF 50; Response 9, 38, 44. Aimbridge subsequently wrote Simpson up for touching Swepson and causing her to get upset. DSOF 51; Response 5, 41, 45, 51. Swepson was unsure whether Simpson knew about her disabilities. DSOF 52; Response 12, 39, 54.[7] Swepson does not recall Simpson saying anything about her disabilities. DSOF 53; Response 13, 40, 53, 54.[8] Swepson concedes that this "raises doubt about any claims of discriminatory intent or specific targeting based on her disabilities" and that the incident "might not have been influenced by her disabilities." Response 55.

---

[7] Swepson provides several facts that seem to concede she was unsure whether Simpson knew about her disabilities, *see* Response 12, 39, 54, and she testified in her deposition that she was unsure Simpson knew about her disabilities. In her additional facts, however, she "disputes the lack of knowledge by Simpson about her disabilities and whether this affected the way interactions between them were handled." PSOF 52. This does not create a question of fact because it is not supported by any evidence. Even putting aside her concessions on this point, Swepson has no evidence that Simpson knew of her disabilities.

[8] Again, Swepson ostensibly disputes this fact in her additional facts. *See* PSOF 53. But she concedes the point elsewhere and identifies no evidence that would put this fact in dispute.

The third incident involved Lasonya Holmes and occurred a few days later. DSOF 28. On October 18, 2021, Swepson's final shift at Aimbridge, Swepson and Holmes had an encounter. DSOF 54. Holmes said Swepson hit Holmes with her hair as she passed, which Swepson disputed. DSOF 55; Response 15, 55. Swepson again pushed the panic button and called police. DSOF 56; Response 16, 56. Swepson was unsure whether Holmes knew about her disabilities. DSOF 58; Response 14, 35, 57. Aimbridge wrote Holmes up for the verbal altercation. DSOF 57.

Although Simpson and Holmes were written up, Aimbridge did not consider whether Swepson should be disciplined for any of these incidents because she was not scheduled to work after October 18. DSOF 59.

Swepson's harassment claim is based on the same three incidents detailed above, as well as a comment a supervisor made about Swepson's performance. DSOF 29; *see also* Response 18. The supervisor was Katie Isherwood, who was hired on July 4, 2021, as the front desk manager. DSOF 30; Response 42. Swepson reported directly to Isherwood after July 4. DSOF 31; Response 45. Swepson concedes she made errors on the job before Isherwood became her manager, but she claims it was harassment for Isherwood to make comments about it because she was not the manager at the time and did not have "the actual documents or information that shows there were any errors." DSOF 32; Response 48. More specifically, Swepson argues she was hired on July 1, while Isherwood was not hired until July 4, and it was therefore "problematic" for Isherwood to make comments about Swepson's work performance before July 4. Response 44. Swepson believes this could be harassment. *See* Response 47. It is unclear whether Isherwood knew about any of Swepson's claimed disabilities.

Swepson identified some other employees whose work was not as closely scrutinized, but she testified she was not sure "how the management did or didn't scrutinize them." DSOF 60;

Response 34. She also believes another front-desk agent was treated better than her because he was hired as a bartender after McDonald refused to train her. DSOF 61; Response 19, 32; 61. Swepson is not aware whether any of these other employees have a disability. DSOF 63; Response 21, 63 (Plaintiff acknowledging this "limit[s] her ability to make claims about disparate treatment").

### 3.    End of Swepson's Employment

On November 1, the Aloft Hotel changed management companies. DSOF 64. To maintain employment at the hotel, all current employees were required to go to an onboarding session with the new management company, 5 Senses Hospitality. DSOF 64-65. Kaufman texted Swepson that her onboarding session was scheduled for October 26, 2021, at 3:30 p.m. DSOF 66; Response 23. Kaufman told her not to miss it because any employee not signed up for onboarding before October 31, 2021, would have to reapply and be rehired. DSOF 66. Swepson responded to the texts with "Okay thank you" and "Yes ma'am." DSOF 67; Response 25, 28, 47, 60, 65.

Swepson did not attend the onboarding session on October 26 because, in Swepson's view, the text from Kaufman was not a "schedule." DSOF 68; Response 22-23, 26, 60, 64, 66. Swepson did not apply with 5 Senses Hospitality. DSOF 69; Response 27, 61, 69. Aimbridge did not terminate Swepson. DSOF 70; Response 61 (stating that "there is no indication that Aimbridge . . . terminated [Swepson's] employment for performance or other reasons"), 70. Swepson "acknowledges receiving the onboarding instructions but maintains that they were not clear." PSOF 65. She also states her employment ended "due to non-participation in the onboarding process with the new management." PSOF 69. Swepson suggests her failure to report for onboarding "could be a result of the unresolved issues with her previous employment."

Response 16. She also says this could indicate "a misunderstanding or choice not to attend." Response 60.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotation and citation omitted). "Rather, it must come forward with facts supported by competent evidence." *Id.* Courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.    ANALYSIS

In the Pretrial Order, Swepson asserted the following claims:

> Plaintiff has physical and mental impairments that limit major life activities, called disabilities. Defendant discriminated against Plaintiff's disabilities under the Americans with Disabilities Act as amended. The discrimination lawsuit was filed within 2 years of the discrimination in promotions and other privileges during Plaintiff's employment. Between July 2021 and October 2021, Plaintiff was subject to questions asked about disabilities before a job offer was made, and was denied reasonable accommodation to the known physical and/or mental limitations of Plaintiff. While employed by Defendant, Plaintiff was pushed, shoved, threatened, called names and subjected to disparate treatment compared to similarly situated

employees which resulted in exacerbation of disabilities, lifelong
trauma, PTSD, and damages.

Doc. 154 at 7. Aimbridge construes this as Swepson asserting claims for "failure to accommodate,
disability discrimination, and harassment based on disability." Doc. 156 at 8. The Court finds that
Aimbridge's understanding is a reasonable and inclusive interpretation of Swepson's description
of her claims in the Pretrial Order. Thus, it considers those three claims.[9]

Swepson also refers to race or gender discrimination at various points in her briefs. *See*
Doc. 176 at 8-9, 33; *see also* Doc. 178 at 1 (referencing Title VII). Claims based on race or gender
discrimination are not in the Pretrial Order. The pretrial order in a case controls the course of the
action. *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276 (10th Cir. 2006). Parties are expected
to identify their claims and the issues for trial and "issues not contained in the resulting pretrial
order [are] not part of the case . . . ." *Id.* at 1276-77. Failing to include claims and defenses in the
pretrial order waives those claims and defenses. *See id.* Thus, to the extent Swepson is attempting
to pursue claims for race or gender discrimination, the Court finds those claims were not included
in the Pretrial Order and have therefore been waived.[10]

Swepson also challenges the findings of the Kansas Human Rights Commission ("KHRC")
at various points in the briefing. *See, e.g.*, Doc. 176 at 9. But those findings aren't at issue in this
case, nor does this case function as an appeal of any action by the KHRC. Put simply, the findings
of the KHRC are largely irrelevant to this case.[11]

---

[9]   The Court refers to Swepson's disability-discrimination claim as a disparate-treatment claim to distinguish it from
    a failure-to-accommodate or hostile-work-environment claim, which are all forms of disability discrimination.

[10]   There were no such claims alleged in the complaint either. In the complaint, Swepson checked the box for failure
    to accommodate and harassment, and she added the notation "Discrimination due to disability." Doc. 1 at 3. In
    indicating how she was discriminated against, she only checked the box for disability, not race or gender. *Id.* The
    complaint also states it is brought under the ADA, not Title VII. *Id.* at 1.

[11]   One of Swepson's additional facts suggests the KHRC failed to include some documents in its investigation and
    that "[d]iscovery is still needed." PSOF 23. It's not clear what Swepson is referring to, nor does she explain why
    additional discovery would be needed. Swepson previously filed a motion to compel the KHRC to produce

### A.    Failure to Accommodate

Aimbridge first moves for summary judgment on Swepson's failure-to-accommodate claim. Doc. 156 at 20-24. It argues Swepson cannot establish she is disabled under the ADA or that there is any accommodation Aimbridge failed to grant.

The ADA[12] prohibits discrimination based on disability. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1047-48 (10th Cir. 2017). One way an employer can discriminate under the ADA is by failing to accommodate an employee's disability under certain circumstances. *See id.* at 1048. A plaintiff establishes a prima facie claim of failure to accommodate by showing that (1) she was disabled; (2) she was otherwise qualified for the job; (3) she requested a plausibly reasonable accommodation; and (4) her employer refused to accommodate the disability. *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020). The first and fourth elements are at issue here.[13]

### 1.    Whether Swepson is Disabled

Aimbridge argues that Swepson cannot establish that she is disabled under the ADA with regard to either her alleged physical or mental conditions. Doc. 156 at 21.

A disability under the ADA is "a physical or mental impairment that substantially limits one or more major life activities." *Aubrey*, 975 F.3d at 1006 (quoting 42 U.S.C. § 12102(1)(A)). Disability is defined to include an actual impairment, as well as "a record of such an impairment"

---

Aimbridge's responses to investigative questions asked during the KHRC investigation. *See* Doc. 175 at 1. The Court found that the KHRC had confirmed that Swepson had all submissions by both parties. *Id.* at 2. Based on this, and on the fact that Swepson had waited several months after receiving the KHRC records—until after discovery closed and summary-judgment briefing was underway—to bring the issue to the Court's attention, the Court denied the request to compel any action from the KHRC, a non-party to this case. *Id.* at 2-3.

[12]    The governing law is now the ADA Amendments Act of 2008 ("ADAAA"). The Court applies the amended law and regulations. But the Court continues to use the term "ADA" for ease of reference.

[13]    If a plaintiff establishes a prima facie case, the burden shifts to the defendant to either come forward with evidence rebutting the plaintiff's prima facie case or else establishing an affirmative defense. *Aubrey*, 975 F.3d at 1005. Although the burden of establishing a prima facie case is not onerous, *see id.*, the Court finds Swepson has not met her obligation and therefore the burden does not shift to Aimbridge.

or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). A plaintiff shows an actual disability by coming forward with evidence of "(1) an impairment (2) that substantially limits (3) one or more major life activities." *Justman v. Hays Feed Yard, LLC*, 2023 WL 5610149, at *3 (D. Kan. 2023). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

"Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for the court to decide." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (internal quotation and citation omitted). The determination of "whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment." *Id.*

### a.    Physical Disabilities

Swepson claims that she has an actual physical disability of plantar fasciitis, as well as a right foot injury. *See* Doc. 176 at 31. She contends her "physical limitations affected her ability to stand for long periods." *Id.* at 32. Aimbridge argues Swepson has not presented evidence that her claimed physical disabilities—plantar fasciitis, a sprained ankle, and stress fractures in her right leg from 2018—substantially impact her major life activities. Doc. 156 at 21-22.[14]

---

[14]    It appears that the only evidence that Swepson actually has any impairments is her testimony that she does. The Court is not aware of any medical records in evidence that would establish any particular diagnosis. Although Aimbridge briefly states Swepson has not "provided any medical documentation to establish these disabilities," Doc. 156 at 22, the Court does not perceive Aimbridge to be disputing that Swepson actually has her claimed conditions—just that she has not come forward with sufficient evidence showing how those alleged impairments substantially limit her major life activities. The Court therefore assumes without deciding that Swepson has established she has a physical impairment.

Swepson has failed to come forward with sufficient evidence that she has an impairment that substantially limits a major life activity. At most, Swepson has identified an impairment and certain major life activities. But there is no evidence connecting the two. *See Justman*, 2023 WL 5610149, at *4 ("Daniel has thus identified (1) an impairment and (2) major life activities. The critical question is whether he has connected the two."); *Clancy v. Miller*, 837 F. App'x 630, 636 (10th Cir. 2020) ("Without expert testimony to diagnose her condition while she worked at Fort Riley, and further to link the diagnosis to a limitation on a major life activity, Clancy did not offer enough evidence to create a genuine dispute over whether she had an actual disability."). Importantly, not every impairment constitutes a disability. *Vannattan v. VendTech-SGI, LLC*, 2017 WL 2021475, at *3 (D. Kan. 2017). Whether an impairment substantially limits a major life activity is an individual assessment. *Id.* As the Court recognized in *Justman*, although the burden of stating a prima facie case is not onerous, there must be <u>some</u> evidence of substantial impairment. *Justman*, 2023 WL 5610149, at *4 ("Daniel has offered nothing but unspecific conclusory statements attributing any limitations to his major life activities to his concussion."); *see also Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1143 (10th Cir. 2011) ("Because this [substantial-limitation element] is a factual determination, the relevant question for the purpose of this appeal is whether Carter has presented enough evidence to create a genuine dispute as to any material fact that necessitates resolution by a jury." (internal citation omitted)).[15] Here, Swepson only testified that that her physical impairments "impact" certain life activities. *See* DSOF 17. This is not sufficient evidence on which a jury could rely to find that Swepson's impairments

---

[15] *Justman* discussed types of evidence that can be used to show a major life activity is substantially limited. *See Justman*, 2023 WL 5610149, at *5 (citing 29 C.F.R. § 1630.2(j)). Although not exhaustive, no similar evidence has been presented here.

"substantially limit" her major life activities.[16] *See Dancause v. Mount Morris Cent. Sch. Dist.*, 590 F. App'x 27, 28-29 (2d Cir. 2014) ("But short of reciting activities found in the statute that she could not 'adequately' perform, Dancause did not allege any <u>facts</u> from which a court could plausibly infer that her periodontal disease substantially limited these major life activities.").

Further, there is evidence in the record that Swepson's major life activities are not limited, let alone substantially impaired. *See Justman*, 2023 WL 5610149, at *5. Although she offered conclusory testimony of the ways in which her physical conditions impact her major life activities, *see* DSOF 17 (testimony by Swepson that her foot injuries impact her life while sitting, standing, laying down, cleaning, cooking, sleeping, washing or doing her hair, enjoying herself, traveling, bathing, showering, and during bowel movements), she also testified that she lives alone, is able to care for herself, and is able to drive, *id.* She also testified that by May 2019 her foot had healed and she was able to return to work, which was two years <u>before</u> she began working for Aimbridge. DSOF 16 (reflecting testimony by Swepson that "I was healed up. My foot [] injury had healed." (brackets in original)).

In sum, there is no evidence from which a reasonable jury could find that Swepson has a physical impairment that substantially limits any of the major life activities identified.

### b.    Mental Disabilities

As for her claimed mental conditions of PTSD, depression, and anxiety, Aimbridge argues Swepson has never identified any major life activities that are affected by these conditions. During her deposition she only testified about the ways in which her <u>physical</u> conditions impact her life.

---

[16] The only testimony Swepson gave of a specific impact was regarding the impact of plantar fasciitis and her leg issues on her bowel movements. When asked about this, Swepson testified, "Do you understand that you have to brace yourself to be able to use the bathroom?" Doc. 156-4 at 26 (deposition testimony at 154:21-24). She also testified that she occasionally needs a chair to work, presumably because she cannot stand for long periods. DSOF 19. To the extent that would be sufficient evidence that her conditions substantially impair her major life activities of standing or caring for herself, Swepson's disability-based claims fail for alternative reasons discussed below.

*See* DSOF 17. She never identified any major life activities impacted by her <u>mental</u> conditions, DSOF 18, let alone any major life activities that are substantially limited as a result of her mental conditions.

The Court finds Swepson has failed to establish she is disabled based on her mental conditions of PTSD, depression, or anxiety. She has not pointed to any evidence that she has these impairments, nor has she identified any major life activities that are substantially limited by them.

Based on this, Swepson has not met her burden of establishing that she is disabled.[17] This is sufficient grounds to grant summary judgment to Aimbridge on Swepson's failure-to-accommodate claim.

### 2.    Refusal to Accommodate

Even if Swepson had established that she is disabled for purposes of the ADA, her failure-to-accommodate claim still fails. Aimbridge argues that it granted every reasonable

---

[17] In response to Aimbridge's argument that she never disclosed her mental conditions or requested an accommodation for them, Swepson argues that "her mental health conditions, while not initially disclosed in detail to Defendant, were apparent through her emotional state and behavior in the workplace," and that Aimbridge "should have taken proactive steps to accommodate her mental health conditions, even without a formal request." Doc. 176 at 32. Neither party suggests that Swepson is arguing she satisfies the "regarded as" definition of disabled. Nor could Swepson prevail under that definition. "A plaintiff claiming discrimination under the 'regarded as' definition of disability must show (1) he has an actual or perceived impairment, (2) the impairment is 'neither transitory nor minor,' and (3) the employer perceived him as being impaired." *Justman*, 2023 WL 5610149, at *6; *see also Adair v. City of Muskogee*, 823 F.3d 1297, 1305-06 (10th Cir. 2016). All Swepson has presented is a brief statement that Aimbridge should have known about and accommodated her mental conditions based on her behavior in the workplace. This is not sufficient evidence to establish that Aimbridge "regarded" her as disabled. There is no evidence that Aimbridge perceived Swepson as disabled. At most, Swepson points to her "emotional state and behavior" to suggest that Aimbridge <u>should have</u> considered her disabled and acted accordingly. But she offers no legal support for this position. Further, it is unclear what "emotional state and behavior" she is referring to. To the extent she is referring to the two interactions with Simpson and Holmes, where both times Swepson pushed the panic button and called police for seemingly minor disputes, those two events occurred on October 14 and October 18, and it is undisputed that those two work shifts were her final two work shifts with Aimbridge. DSOF 43. Moreover, "[i]t is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests." *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 993 (10th Cir. 2021) (internal quotation and citation omitted). An employer's obligation to engage in the interactive process "is only implicated if it is on notice that an employee has requested disability accommodations." *See id.* at 993 n.11. The "ADA does not require clairvoyance." *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810-12 (10th Cir. 2016) (explaining that mental disabilities are not generally the "obvious" disabilities that an employer would notice) (internal quotation and citation omitted).

accommodation request that Swepson made. Doc. 156 at 22-23. The undisputed facts support this argument.

It is undisputed that during the hiring process, Swepson stated she would need a chair. DSOF 20. But when she started working, Swepson said she did not need a chair and wanted to "see how heavy the caseload is." DSOF 21; *see also* Response 36. By her third day, Swepson decided she did need a chair, and Aimbridge provided one. DSOF 21; Response 6, 36. Swepson used the chair regularly for the duration of her employment, though she also chose to stand at times. DSOF 21; Response 36.[18]

Swepson does not identify any other accommodation that she needed or requested but was denied. *See Adair*, 823 F.3d at 1310 (stating that the burden is on the plaintiff "to show the existence of a reasonable accommodation"); *Ewing*, 673 F. App'x at 814 (explaining that an employer must know both that an employee has a disability and that an accommodation is needed). She argues in her response that she informed Aimbridge she needed a chair but Aimbridge "delayed providing this accommodation" and that "the evidence shows that there was a delay of several days before Plaintiff received the necessary accommodation." Doc. 176 at 32. This argument is specious. Swepson testified that she asked for a chair before and after she was hired and that Aimbridge gave her a chair. DSOF 20; *see also* Doc. 156-4 at 9 ("Q. Okay. And did they give you a chair? A. They did, upon me asking."). Swepson also testified that she told Aimbridge at the start of her employment that she "wouldn't need a chair" because she wanted "to see how heavy the caseload is." DSOF 21 (citing Swepson's deposition testimony at 152:19-25). By her third day, Swepson decided she need the chair, and Aimbridge provided it. DSOF 21; *see also*

---

[18] At some point during her employment, Swepson was asked for medical documentation regarding how long she needed to sit, but Aimbridge has no record of receiving this information. DSOF 22. There are no facts suggesting this impacted Swepson's use of a chair. It is undisputed Swepson had access to the chair for the duration of her employment. DSOF 21.

Response 36. Thus, Swepson worked two or three days without a chair because <u>Swepson</u> decided she didn't need one, not because Ambridge failed to accommodate her. No reasonable jury could determine on these undisputed facts that Aimbridge failed to accommodate Swepson's need for a chair.[19]

Swepson also once asked to leave work early because she was "uncomfortable." DSOF 24. It is unclear whether this was a requested accommodation, but Aimbridge allowed her to leave. *See id.* Swepson also asked for an accommodation in the form of six or six-and-a-half hour shifts. DSOF 25. Aimbridge complied by giving her a "flex seven hours," which included two breaks and 30 minutes for lunch. *Id.* Swepson testified she "was working well having those accommodations being met." *Id.*; Response 6. To the extent these scheduling requests were requested accommodations, no reasonable jury could find that Aimbridge failed to grant them.

Because Swepson has not established she is disabled or that Aimbridge denied her any requested reasonable accommodation, Aimbridge is entitled to summary judgment on the failure-to-accommodate claim.

## B.    Disparate Treatment

Swepson's next claim is for disparate treatment based on disability. A claim for disparate treatment based on disability is analyzed under the *McDonnell-Douglas* burden-shifting test. *Edmonds-Radford*, 17 F.4th at 989. The plaintiff must first establish a prima facie case: (1) she is disabled, (2) she was qualified to perform the essential functions of the job with or without

---

[19]   It's not entirely clear whether Swepson alleges Aimbridge failed to accommodate her alleged disability when McDonald said she could not sit down while working as a bartender. *See* DSOF 36; Response 8. To the extent she does, no reasonable jury could find that Aimbridge failed to accommodate her disability based on this. It is undisputed that Swepson asked her manager if she could have access to a chair, and he said she could. DSOF 35; Response 7. Although McDonald said she could not sit down while working as a bartender, DSOF 36; Response 8, he did say she could sit on a chair at the end of the bar. DSOF 37. So Swepson did have access to a chair. Additionally, Swepson did not share the nature of her disabilities with McDonald, DSOF 41; Response 11, nor is there any evidence that McDonald was in a position to grant or deny an accommodation.

reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *See id.* at 989-90. The burden then shifts to the defendant to articulate nondiscriminatory reasons for its actions. S*ee id.* at 990. The plaintiff then bears the burden of showing the proffered reason was pretext for discrimination. *See id.*

As an initial matter, Swepson's disparate-treatment claim fails for the same reason her failure-to-accommodate claim fails: she has not established she is disabled. This is sufficient grounds, standing alone, to grant Aimbridge summary judgment on this claim.

Aimbridge alternatively moves for summary judgment on this claim because Swepson cannot point to any adverse employment action she suffered. Doc. 156 at 26-29. It is not entirely clear what adverse employment actions are at issue. Swepson's submissions in the Pretrial Order never explicitly make clear what adverse actions she is basing her disparate-treatment claim on. She claims she was "pushed, shoved, threatened, called names and subjected to disparate treatment compared to similarly situated employees . . . ." Doc. 154 at 7. She also included references that she was "subject to harsh judgmt," that it is "an unfair workplace practice[] to be harshly scrutinized against and treated less favorably," and that there is no evidence that Aimbridge "extend[ed] an offer to continue training [Swepson] for promotion." *Id.* at 2-4. Finally, there is a reference to the three disputes she had with coworkers. *Id.*

In her response brief, Swepson identifies four potential adverse employment actions. First, she claims she was treated less favorably than McDonald and Zurchmiede,[20] who "were not subject to the same scrutiny or limitations" or "required to undergo the same burdensome training or documentation requests." Doc. 176 at 34. Second, she claims she was "denied promotion and

---

[20]  Swepson indicates Zurchmiede is the front desk agent who was promoted to bartender. Doc. 176 at 34. Aimbridge's brief lists this person's name as Zurschm. DSOF 61.

cross-training opportunities that were offered to non-disabled employees." *Id.* Third, she cites the incidents with McDonald, Simpson, and Holmes, though it is unclear whether she is relying on these incidents for her disparate-treatment claim, her hostile-work-environment claim, or both. *Id.* at 33. And fourth, she cites her termination. *Id.* at 32. The Court will analyze her disparate-treatment claims based on these four alleged adverse actions.

First, Swepson argues McDonald and Zurchmiede were not given the same scrutiny or required to undergo the same "burdensome training or documentation requests." *Id.* at 34. It is unclear what this refers to, and there is no evidence to support it regardless. Further, to the extent Swepson complains she was required to undergo training, that is not an adverse employment action on this record. An adverse employment action for purposes of a substantive ADA disparate-treatment claim requires an action "that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).[21] A mere inconvenience or an action with de minimis impact on a job will not suffice. *See id.*[22]

To the extent Swepson complains it was unfair for Isherwood to critique her work performance without documentation or to criticize her work between July 1 (when Swepson

---

[21] The Supreme Court recently held that, under Title VII, an employee who was transferred as a result of alleged discrimination does not have to show that the harm resulting from the transfer was "significant." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). It doesn't appear that the Tenth Circuit has addressed *Muldrow* in the context of ADA claims, or the extent to which it applies outside of the transfer context. To the extent the standard in ADA cases no longer incorporates the "significant" modifier, that distinction is not important here. As discussed above, Swepson has not identified <u>any</u> action taken against her, adverse, significant, or otherwise. The Court also notes that retaliation claims employ an altogether different standard for judging adverse employment actions. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). Swepson does not allege retaliation.

[22] There is also no causal link between these actions and Swepson's disability. Swepson is unaware whether any of the other employees had a disability. DSOF 63; Response 21; 63. Swepson has also not established McDonald and Zurchmiede (or Zurschm)—or any other employee—were similarly situated to her.

started) and July 4 (when Isherwood started), nothing about this meets the standard of an adverse employment action under the standard outlined above. As Aimbridge notes, Swepson conceded she made errors at the start of her employment, but simply disputes that Isherwood should've been the one to point it out. DSOF 32. This does not rise to the level of an adverse employment action. *See E.E.O.C.*, 644 F.3d at 1040.[23]

Second, Swepson argues she was denied promotional opportunities. Aimbridge agues that Swepson cannot sustain a disparate-treatment claim based on a failure to promote because it is undisputed that Swepson never applied for an open position. *See* DSOF 10. Under the facts of this case, not receiving a promotion or position that the employee never pursued or applied for is not an adverse-employment action. *See Harper v. Arrow Elecs.*, 2021 WL 37665, at *7 (D. Colo. 2021).

To the extent Swepson complains that another front-desk agent was promoted to bartender instead of her, it is undisputed that there were no open bartending positions in July 2021 when Swepson briefly trained for the role, and she also testified she was not interested in becoming a bartender. DSOF 42, 62; Response 20, 29, 62. She has not come forward with any facts that she continued to pursue the bartending position or ever applied for it. This does not demonstrate an adverse employment action. *See, e.g.*, *Harper*, 2021 WL 37665, at *7 ("Here, Harper seeks relief based on a failure to promote for a job she did not apply for . . . . Harper's employment status, compensation, and benefits remain unaffected by the alleged actions of Defendant, so she has not faced an adverse employment action.").[24]

---

[23] Nor is there any evidence that Isherwood was motivated by or even knew about Swepson's disabilities.

[24] Even if Swepson could identify an adverse employment action based on not being promoted, she has not shown a causal link to her claimed disabilities.

Third, Swepson cites the incidents with McDonald, Simpson, and Holmes. Notably, however, none of these incidents resulted in any change in Swepson's employment status, such as hiring, firing, reassignment, or a change in benefits. There is nothing in the record that Swepson was ever even disciplined for these incidents, while at least Simpson and Holmes were. DSOF 51, 57; Response 5, 41, 45, 51. These do not satisfy the standard for an adverse employment action. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (noting that the ADA is not a "general civility code" that "mak[es] actionable the ordinary tribulations of the workplace" (internal quotation and citation omitted)).[25]

Fourth, Swepson complains about Aimbridge's handling of her onboarding with the new management company and her termination. Doc. 176 at 32-33.[26] Ordinarily, a termination satisfies the standard for an adverse employment action. However, it is undisputed that Aimbridge never terminated Swepson. DSOF 70; Response 61 (stating that "there is no indication that Aimbridge . . . terminated [Swepson's] employment for performance or other reasons"). Aimbridge's role in managing the hotel was ending. DSOF 64. A new management company was taking over, and employees were required to attend an onboarding meeting to continue working for the new employer. Swepson never attended, nor did she reapply with the new company. DSOF

---

[25] Swepson also testified that she was unaware whether any of these individuals even knew of her disabilities. DSOF 52, 53, 58; Response 12-14, 35, 39-40, 53-54, 57. Thus, even if the three incidents could be considered adverse employment actions, Swepson has not causally connected any of these incidents to her disability. *See Edmonds-Radford*, 17 F.4th at 990 ("Critically, Edmonds-Radford does not refute the evidence showing that the Southwest decisionmakers involved in her termination . . . did not know of her disability.").

[26] In its reply brief, Aimbridge argues that Swepson cannot challenge her termination because she did not exhaust her administrative remedies for that claim. Doc. 182 at 15-16. Although Aimbridge cites Swepson's EEOC Charge, it is unclear where it is in the record, if at all. Because it is a defendant's burden to establish the failure-to-exhaust affirmative defense, *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185-86 (10th Cir. 2018), the Court declines to dismiss Swepson's disparate-treatment claim based on her alleged termination for failure to exhaust. The Court does agree, however, that no claim based on termination is in the complaint or the Pretrial Order. *See* Doc. 1 at 3; *see generally* Doc. 154. The failure to assert or preserve such a claim is alternative grounds for granting summary judgment, in addition to the other reasons discussed above. *See Cortez*, 460 F.3d at 1276.

65, 68-69; Response 22-23, 26-27, 60, 64, 66, 69. Although Swepson clearly stopped working at the hotel, there are no facts in the record that Aimbridge terminated her.

Swepson contends that the text messages telling her not to miss the onboarding meeting were somehow ambiguous because they did not "clearly state that missing the onboarding session would result in termination." Doc. 176 at 32-33. First, this claim is dubious. Kaufman told her not to miss the onboarding session because any employee not signed up for onboarding before October 31, 2021, would have to reapply and be rehired. DSOF 66. Specifically, Kaufman wrote, "Make sure you do not miss it [the onboarding meeting] because anyone not signed up by the 1st has to be hired outside of [A]imbridge." Doc. 156-12 at 4. Swepson responded to the text, "Yes ma'am." *Id.* No reasonable jury could find this ambiguous. Second, even if it was ambiguous and Swepson did not understand the significance of the onboarding meeting, this does not change the undisputed fact that Aimbridge never terminated Swepson's employment.

Finally, even if Swepson could rely on termination to meet the adverse-employment-action element, she would still fail to establish a prima facie case of disparate treatment. To succeed on a disparate-treatment claim based on disability, the plaintiff's disability must have "actually motivated the employer's decision" at the heart of the claimed adverse-employment action. *See Edmonds-Radford*, 17 F.4th at 990 (internal quotation and citation omitted). "This requires some affirmative evidence that the disability was a determinative factor in [the employer's] decision." *Id.* Here, Swepson has not pointed to any evidence linking the end of her employment to her disability. *Carter*, 662 F.3d at 1147 ("To survive summary judgment, Carter must produce enough evidence for a reasonable jury to conclude that he was fired because of his disability."). Nor has

she shown that Aimbridge's explanation for the end of Swepson's employment—her not attending the onboarding meeting—is a pretext for discrimination.[27]

In sum, Swepson has not established a prima facie case of disparate treatment based on disability because she has not established she is disabled and has not identified an adverse employment action taken because of her disability. Nor has she put forward any non-conclusory argument of pretext. Accordingly, Aimbridge is entitled to summary judgment on Swepson's disparate-treatment claim.

### C.    Hostile Work Environment

Swepson's final claim is that she was subjected to harassment, or a hostile work environment, based on her disability. "For a hostile environment claim to survive summary judgment, [the plaintiff is] required to present evidence from which a rational jury could find that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, and the harassment stemmed from disability-related animus." *Schlecht*, 626 F. App'x at 779.[28]

Swepson claims she was subjected to a hostile work environment based on disability because of the three incidents with McDonald, Simpson, and Holmes. Doc. 176 at 33. No

---

[27]  The only evidence of pretext Swepson cites is the "shifting explanations regarding the need for medical documentation for the chair accommodation and the ambiguity surrounding the Plaintiff's termination due to missed onboarding . . . ." Doc. 176 at 34. Neither of these give rise to an inference of discrimination. There are no facts suggesting a "shifting explanation" about medical documentation. It is undisputed that Swepson asked for a chair and was given one. At some point she may have been asked for medical documentation, but it is unclear whether she ever provided it, and it did not impact her use of the accommodation. DSOF 21-22. And as discussed above, there was no ambiguity regarding onboarding that gives rise to an inference of discrimination.

[28]  Swepson's failure to establish that she is disabled would be fatal to her hostile-work-environment claim, as it is to her other claims. *Clancy*, 837 F. App'x at 635 ("Clancy's discrimination and hostile-work-environment claims require her to show that she is a qualified individual with a disability." (internal quotation and citation omitted). The Court nevertheless analyzes the other factors of her claim.

reasonable jury could rely on these three incidents to find that Swepson was subjected to a severe or pervasive hostile work environment based on disability.

First, there is no evidence that any of these incidents stemmed from a disability-related animus. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897-98 (10th Cir. 2017) ("Whether a plaintiff attempts to prove discrimination based on discrete acts taken by an employer or based on a hostile work environment, he must produce evidence from which a rational jury could conclude the employer took those actions <u>because of</u> his disability."). Swepson has not come forward with any evidence that McDonald, Simpson, or Holmes even knew Swepson had or claimed to have a disability. *See id.* at 898 (denying liability where there was no evidence that anyone at employer knew of disability). The two incidents with Simpson and Holmes arose out of alleged physical encounters, and there are no facts about either of those incidents to suggest they had anything to do with or were motivated by any disability. *See id.* at 897 ("General harassment alone is not actionable."). As for the incident with McDonald, Swepson informally asked McDonald if she could sit down. He told her she could not sit down while working as a bartender, but he did direct her to a chair near the bar. Swepson never shared the nature or existence of her disabilities with McDonald. To the extent this could even be considered harassment by McDonald, there are no facts from which a jury could find that McDonald's actions stemmed from a disability-related animus.

Second, these incidents are not sufficiently severe or pervasive to rise to the level of a hostile work environment. In making this determination, courts "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation and citation omitted). The incident

with McDonald happened in July, and the other two in October. Three incidents like those here over the course of a few months is not pervasive harassment. *See Ewing*, 673 F. App'x at 815 (noting that "a few isolated incidents of workplace abuse are insufficient grounds on which to sustain a hostile work environment claim" (internal quotation and citation omitted)). Nor were any of them severe. The incident with McDonald seems to be little more than a disagreement by Swepson with McDonald's training method. She did not want to continue the training and it did not otherwise impact her job. The incident with Holmes was a verbal disagreement that Swepson seems to have escalated by pushing a panic button and calling police. There may have been physical contact between Swepson and Simpson, as both parties are alleged to have shoved the other. DSOF 46; Response 50-51. While unfortunate and unprofessional, no reasonable jury could conclude based on that isolated incident that Swepson experienced a severe hostile work environment, let alone one based on disability. *See Anderson*, 181 F.3d at 1178.[29]

Aimbridge is entitled to summary judgment on the hostile-work-environment claim.[30]

---

[29] At times, Swepson has also cited Isherwood's critique of her work as part of her hostile-work-environment claim. She does not cite that as part of that claim in her brief. *See* Doc. 176 at 33. But even if the Court did consider it as part of the claim, it would not change the outcome. As discussed above, Swepson complains Isherwood counseled her on her performance without "actual documents or information that shows there were any errors," DSOF 32; Response 48, and for mistakes made between July 1 and July 4 before Isherwood became her supervisor. However, Swepson also concedes she did make mistakes. DSOF 32. Counseling by a supervisor under these circumstances is not severe or pervasive harassment. Nor does Swepson point to any evidence suggesting that this counseling affected her job or was motivated by a disability.

[30] In her brief, Swepson contends she "repeatedly informed her supervisors and management about the harassment" and "[t]he evidence shows that management either ignored or inadequately addressed the hostile conduct." Doc. 176 at 32-33. As a preliminary matter, without an actionable hostile-work-environment claim, this argument is irrelevant. Moreover, there is no evidence to support this contention. At most, there is evidence that management was aware of the three incidents involving McDonald, Simpson, and Holmes. But there is no evidence that Swepson repeatedly reported any harassment, or evidence that management ignored any of the incidents. After her failed training with McDonald, Swepson asked and was allowed to go home, and she did not continue training with McDonald. And both Simpson and Holmes were written up, suggesting Aimbridge did take steps to address the incidents. *Cf. Redmon v. Gen. Motors Co.*, 2019 WL 2393166, at *15 (D. Kan. 2019) ("Based on the absence of investigative steps and disciplinary decisions, a jury could find that defendants failed to take steps reasonably calculated to end the harassment plaintiff experienced."). Swepson faced no discipline, in part because she never worked at the hotel after the last two incidents with Simpson and Holmes. No reasonable jury could conclude on these facts that management ignored or inadequately addressed these incidents. Relatedly, Aimbridge asserts the *Faragher/Ellerth* affirmative defense. Doc. 156 at 34. "Under the *Faragher/Ellerth* framework, an employer is subject to vicarious liability for actionable sexual harassment perpetrated by a supervisor with immediate (or

## IV.    CONCLUSION

In sum, Swepson's failure-to-accommodate claim fails because she has not established that she is disabled or that any requested accommodation was denied. Swepson's disparate-treatment claim fails because she has not established that she is disabled or that she suffered any adverse employment action because of a disability. Swepson's hostile-work-environment claim fails because she has not established that she is disabled and has not established that she suffered any severe or pervasive harassment because of a disability.

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment (Doc. 155) is GRANTED. Aimbridge is entitled to summary judgment on all claims. This case is closed.

IT IS SO ORDERED.

Dated: December 5, 2024                            /s/ *Holly L. Teeter*
                                                  HOLLY L. TEETER
                                                  UNITED STATES DISTRICT JUDGE

---

successively higher) authority over the victimized employee" in certain situations. *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011). To the extent this defense applies in this situation, the Court does not need to reach the issue because Swepson has not met requisite showing that she was subject to a hostile work environment, and thus Aimbridge is not liable regardless.